# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

SETH J. BERL,

     Plaintiff,

v.                                                        Civil Action No. <u>3:21CV00048</u>

EXPERIAN INFORMATION SOLUTIONS INC.;
EQUIFAX INFORMATION SERVICES, LLC;
TRANS UNION LLC;
and
HUNTER WARFIELD, INC.,

     Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, SETH J. BERL ("Mr. Berl" or "Plaintiff"), by and through his undersigned Counsel, alleges the following against Defendants EXPERIAN INFORMATION SOLUTIONS INC.; EQUIFAX INFORMATION SERVICES, LLC; TRANS UNION LLC; and HUNTER WARFIELD, INC.

### PRELIMINARY STATEMENT

1.    This is an action for actual, statutory, and punitive damages, costs, and attorneys' fees brought pursuant to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681x.

2.    Today in America there are three major consumer reporting agencies, Equifax Information Services, LLC (hereinafter "Equifax"), Trans Union, LLC (hereinafter "Trans Union") and Experian (hereinafter "Experian").

3.    The FCRA demands of reporting agencies like Equifax, Experian, and Trans Union, that they utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information,

the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

4.    Consumer reporting agencies ("CRAs") that create consumer reports, like Equifax, Experian, and Trans Union, are charged with using reasonable procedures designed to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities like Hunter Warfield, particularly where a consumer makes a dispute about information reported.

5.    Also when a consumer like Plaintiff disputes the accuracy of information through the agencies, those disputes are transmitted to the party furnishing the information, here Hunter Warfield. The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

6.    Plaintiff brings claims under Section 1681e(b) against all three reporting agencies because they reported about Plaintiff inaccurate information regarding a Hunter Warfield collections account. When Plaintiff disputed the inaccuracies, the agencies did not reasonably investigate, also violating Section 1681i.

7.    The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how the CRA Defendants have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. The CRA Defendants have been repeatedly sued by consumers, sanctioned by regulators and reprimanded by both District and Appellate courts to do

more than an automated parroting of what their customer-creditors instruct. Had they followed that advice and heeded those warnings, the Plaintiff would not have been harmed.

8.     Likewise, Hunter Warfield violated the FCRA, Section 1681s-2(b), when it received Plaintiff's disputes from the agencies and failed to reasonably investigate those disputes. Instead, discovery will show all Hunter Warfield did was consult its own records about the account and confirm to the agencies the inaccurate information it was already reporting.

## JURISDICTION & VENUE

9.     The jurisdiction of this Court is conferred by 15 U.S.C. § 1681p.

10.     Venue is proper in this District as Plaintiff is a resident in this District, the violations described in this Complaint occurred in this District, and the Defendants transact business within this District.

## PARTIES

11.     Plaintiff Seth J. Berl is a natural person and a "consumer" as defined by 15 U.S.C. § 1681a(c).

12.     Hunter Warfield, Inc. ("Hunter Warfield") is a debt collector headquartered in Florida and regularly conducts business in this District.

13.     Hunter Warfield is a "furnisher" of information as defined and governed by 15 U.S.C. § 1681s-2.

14.     Defendant Experian Information Solutions, Inc. is headquartered in California and does business in the Commonwealth of Virginia through its registered agent.

15.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

16.     Defendant Equifax Information Services, LLC is headquartered in Georgia and does business in the Commonwealth of Virginia through its registered agent.

17.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

18.     Defendant Trans Union LLC ("Trans Union") is headquartered in Illinois and does business in Commonwealth Virginia through its registered agent.

19.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers*

20.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. See S. Rep. No. 91-517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *Id.* at 36570 (statement of Rep. Sullivan); . . . . In enacting FCRA Congress adopted a variety of measures designed to insure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414-15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

21.     "Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible

accuracy of the information concerning the individual about whom the report relates."

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4

(E.D. Va. Mar. 18, 2011).

22.     Section 1681i(a), on the other hand, requires much more from a CRA after

a consumer has placed it on notice of an inaccuracy through his dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . .  before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

23.     Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate

and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin*

*v. Gen. Motors Acceptance Corp*., 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term

'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching

inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations

omitted).

24.     It has long been the law that a CRA, such as Experian, Equifax, or Trans Union,

does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by

merely contacting the creditor who supplied the disputed item. *See, e.g., Pinner v. Schmidt*,

805F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency

to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols.,*

*Inc*., 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781

F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-

LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted*, No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

25.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).

26.      As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

27.     Further, as the CRA Defendants are aware, this Court has held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§ 1681e(b) and § 1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . . ." *Id*. at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

28.     It has long been the law – since 1970 in fact – that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Fed. Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

29.    Today, furnishers such as Hunter Warfield, and other of the CRA Defendants' furnishers, have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s. But while the CRA Defendants' duties under § 1681e(b) were enacted in 1970 and have governed since, the duties on furnishers are much recent, enacted on in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

### Plaintiff Discovers the CRA Defendants Were
### Inaccurately Reporting the Hunter Warfield Debt as Plaintiff's Debt

30.    In 2018 and 2019, Plaintiff was the tenant of a condominium unit at 142 Yellowstone Drive, Unit 308, Charlottesville, VA 22903 (the "unit"), more commonly known as "Eagles Landing Condominiums," which was owned and/or managed by Hasbrouck Real Estate Corporation ("Hasbrouck").

31.    On Friday, July 5, 2019 at 4:30 p.m., Plaintiff received a written Notice of Entry from Hasbrouck stating that it had scheduled a window installation by Window Depot in Plaintiff's unit for Monday, July 8, 2019 and to contact Hasbrouck if Plaintiff had any concerns about the installation scheduled by Hasbrouck.

---

[1] *Available at* https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf.

32.     Hasbrouck gave Plaintiff zero business days' notice of the July 8, 2019 entry, which is invalid notice.

33.     Plaintiff, who was at the time a student undertaking his Ph.D. at the University of Virginia, had a fixed experiment schedule preventing Plaintiff from being present at the unit during the proposed window installation on Monday, July 8, 2019.  Meanwhile Plaintiff, who had a scheduled move-out date for July 15, 2019, had several valuable items stacked in boxes which he wanted safeguarded.  Plaintiff therefore immediately contacted Hasbrouck Real Estate on July 5, 2019 upon his receipt of the Notice of Entry and explained his inability to be present at the unit or to secure his valuables elsewhere on July 8, 2019, and asked Hasbrouck to reschedule the window replacement from July 8, 2019 to a date after July 15, 2019 when he would be moving out (an extension of only one week).

34.     Hasbrouck ignored Plaintiff's request and refused to reschedule the window installation.

35.     On July 8, 2019, when Hasbrouck's window installation contractor, Window Depot, showed up at Plaintiff's unit, Plaintiff exercised his right as a tenant in the Commonwealth of Virginia to refuse the contactor entry into his unit.

36.     On July 15, 2019, Plaintiff moved out of the unit managed by Hasbrouck.

37.     On August 13, 2019, after Plaintiff moved out, Hasbrouck purportedly sent Plaintiff an invoice with an amount due of $954.83. Said invoice includes fraudulent fees[2] for line items such as:

_____

[2] Interestingly, the August 13, 2019 invoice purportedly sent by Hausbrouck is based upon a Window Depot invoice dated March 26, 2019, which precedes the July 8, 2019 proposed installation by more than 3 months.

       a.     $851.31 "Additional Day Equipment Rental – Due to tenant refusal of work;" and

       b.     $50.00 "[t]rip fee – Window Depot – tenant refused to allow in unit."

38.     On November 25, 2020, Plaintiff obtained a copy of his credit reports from Equifax and Trans Union, which both revealed an adverse collection account with Hunter Warfield. The Hunter Warfield collections account listed an original creditor of Hasbrouck Real Estate and an outstanding balance of $954, the purported amount due on the August 13, 2019 invoice containing fraudulent charges.

### *Plaintiff Disputes The Inaccuracies With The CRAs*

39.     On December 2, 2020, Plaintiff submitted disputes to Experian, Equifax, and Trans Union regarding the Hunter Warfield account, requesting that Experian, Equifax, and Trans Union correct the inaccurate, erroneous, and unverified representations made by Hunter Warfield on his credit files.

40.     On December 3, 2020, Experian forwarded its investigation results to Plaintiff and advised that it had verified the Hunter Warfield account information as accurate.

41.     On December 4, 2020, Equifax forwarded its investigation results to Plaintiff and advised that it had verified the Hunter Warfield account information as accurate.

42.     On December 8, 2020, Trans Union forwarded its investigation results to Plaintiff and advised that it had verified the Hunter Warfield account information as accurate.

43.     On or about December 18, 2020, Plaintiff submitted his second disputes to Experian, Equifax, and Trans Union regarding the Hunter Warfield account, requesting that Experian, Equifax, and Trans Union reinvestigate the disputed account and correct the inaccurate, erroneous, and unverified representations made by Hunter Warfield on his credit files.

44.     On December 23, 2020, Equifax forwarded its investigation results to Plaintiff and advised that it had verified the Hunter Warfield account information as accurate.

45.     On January 3, 2021, Experian forwarded its investigation results to Plaintiff and advised that it had verified the Hunter Warfield account information as accurate.

46.     Trans Union did not respond to Plaintiff's second dispute letter of December 18, 2020.

47.     On or about January 18, 2021, Plaintiff submitted his third disputes to Experian, Equifax, and Trans Union regarding the Hunter Warfield account, requesting that Experian, Equifax, and Trans Union reinvestigate his dispute and correct the inaccurate, erroneous, and unverified representations made by Hunter Warfield on his credit files.  On January 18, 2021, Experian forwarded its investigation results to Plaintiff and advised that it had verified the Hunter Warfield account information as accurate.

48.     On February 1, 2021, Experian supplemented its investigation results to Plaintiff and again advised it had verified the Hunter Warfield account information as accurate.

49.     Neither Equifax nor Trans Union responded to Plaintiff's third dispute letters of January 18, 2021 directed to them.

50.     On February 6, 2021, Plaintiff submitted his fourth disputes to Experian, Equifax, and Trans Union regarding the Hunter Warfield account, requesting that Experian, Equifax, and Trans Union correct the inaccurate, erroneous and unverified representations made by Hunter Warfield on his credit files.

51.     On February 25, 2021, Trans Union forwarded its investigation results to Plaintiff and advised that it had deleted the Hunter Warfield account from Plaintiff's credit file.

52.     Neither Equifax nor Experian responded to Plaintiff's fourth dispute letters of February 6, 2021 directed to them.

### The CRA Defendants Did Not and Do Not
### Conduct Any Investigation of Most Consumer Disputes

53.     Unknown to the Plaintiff until this lawsuit, it has long been the practice of Experian, Trans Union, and Equifax to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendors located overseas. Both Trans Union and Equifax use the same vendor, previously known as Intelenet Global Services and now as Teleperformace.  Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mail disputes.

54.     If the disputes are made through CRA Defendants' websites, then no further human – overseas or otherwise – touches the dispute at the CRA. The computer takes it from there.

55.     This dispute processing vendors are not hired to perform actual FCRA investigations. Instead, the vendors' sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu and then click that code.

56.     In fact, the CRA Defendants strongly encourage consumers to make disputes through their online websites. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "Not my account."). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Experian, Equifax, or Trans Union. It gets sent to the CRA Defendants' creditor customer (such as Hunter Warfield) for its sole review and consideration.

57.     Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure or other

communication. That mailbox company receives consumer disputes and scans them into a batch of other disputes.

58.     Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

59.     Both Equifax and Trans Union then forward the dispute mail batches to the same third-party, Teleperformance, based in Mumbai, India. Teleperformance uses low-wage employees to work quickly to process the consumer dispute letters received from the Atlanta-based mail company, skimming the letters and selecting one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

60.     Teleperformance and Experian Chile agents are not allowed to do any of these things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

61.     Equifax and Trans Union have taken the position in other litigation that they have no control over the Teleperformance. For example, under oath before another court just this year, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv*., Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

62.     Trans Union has taken and succeeded with this same position. See, e,g., *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).[3]

63.     Regardless of whether these statements are correct, Equifax, Trans Union, and Experian believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

64.     Equifax, Trans Union, and Experian themselves did not conduct any reinvestigation of Plaintiff's many disputes. Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

### The CRA Defendants Forwarded Plaintiff's Disputes to Hunter Warfield, Who Did Nothing

65.     In each instance in which each Plaintiff disputed the Hunter Warfield account with the CRAs, the CRAs forwarded Plaintiff's disputes to Hunter Warfield using an electronic system called "e-Oscar," which is an industry-wide process by which such disputes are electronically communicated to furnishers and dispute results back to CRAs.

---

[3] Defendant Experian took a different route, outsourcing its dispute procedures to an affiliated company, Experian Services Chile, S,A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in this District with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.).

To the extent Experian would reverse course from *Sublett* and argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue his 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as he alleges against Equifax and Trans Union for their farming-out of investigations to Teleperformance.

66.     e-Oscar is also the system by which Hunter Warfield has agreed it will accept such consumer disputes from the CRAs.

67.     Under such circumstances, Hunter Warfield became obligated under the FCRA to investigate Plaintiff's disputes.

68.     Plaintiff's disputes to Hunter Warfield, made in an attempt to have it reinvestigate his complaints, went unanswered, as it still continued to report the derogatory payment history regarding the Plaintiff.

69.     Hunter Warfield failed to reinvestigate Plaintiff's complaints.

70.     Discovery will show that all Hunter Warfield did when supposedly investigating Plaintiff's disputes was consult its own internal account records and simply report back to the CRAs the same inaccurate information Plaintiff was disputing.

71.     The information furnished by Hunter Warfield to Equifax, Trans Union and Experian was at all times inaccurate.

72.     On or about a date better known to Experian and Hunter Warfield, Experian furnished Plaintiff's disputes to Hunter Warfield.

73.     Hunter Warfield failed to reasonably reinvestigate Plaintiff's disputes that Hunter Warfield received from Experian in violation of § 1681s-2(b)(1)(A) of the FCRA.

74.     Defendant Hunter Warfield further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's disputes from Experian and prior to the commencement of this action.

75.     Experian responded to Plaintiff's disputes, claiming the information was reported verified as accurate and the information was updated. This response confirms that Experian communicated Plaintiff's disputes to Hunter Warfield.

76.     Plaintiff made a dispute to Trans Union, requesting that Trans Union verify and correct the inaccurate, erroneous and unverified representations made by Hunter Warfield on his credit file.

77.     On or about a date better known to Trans Union and Hunter Warfield, Trans Union furnished Plaintiff's disputes to Hunter Warfield.

78.     Hunter Warfield failed to reasonably reinvestigate Plaintiff's disputes that Hunter Warfield received from Trans Union in violation of § 1681s-2(b)(1)(A) of the FCRA.

79.     Defendant Hunter Warfield further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information for a period of time subsequent to receiving Plaintiff's dispute from Trans Union and prior to the commencement of this action.

80.     Trans Union responded to Plaintiff's disputes, claiming the information was reported verified as accurate and the information was updated. This response confirms that Trans Union communicated Plaintiff's dispute to Hunter Warfield.

81.     Plaintiff made a dispute to Equifax, requesting that Equifax verify and correct the inaccurate, erroneous and unverified representations made by Hunter Warfield on his credit file.

82.     On or about a date better known to Equifax and Hunter Warfield, Equifax furnished Plaintiff's disputes to Hunter Warfield.

83.     Hunter Warfield failed to reasonably reinvestigate Plaintiff's disputes that Hunter Warfield received from Equifax in violation of § 1681s-2(b)(1)(A) of the FCRA.

84.     Defendant Hunter Warfield further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information for a period of time subsequent to receiving Plaintiff's dispute from Equifax and prior to the commencement of this action.

85.     Equifax responded to Plaintiff's disputes, claiming the information was reported verified as accurate and the information was updated. This response confirms that Equifax communicated Plaintiff's dispute to Hunter Warfield.

### *Plaintiff Suffered Actual Harm*

86.     Defendants have continued to report the derogatory Hunter Warfield account on the each of the Plaintiff's credit reports, despite being notified that this information was false.

87.     Plaintiff has been attempting to resolve these matters with Defendants and his credit was significantly destroyed by Defendants' failure to correct the inaccurate reporting.

88.     As a result of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

a.     Stress associated with being denied the ability to refinance or to obtain a new mortgage, and associated delays in applying for future lines of credit;

b.     Monies lost by attempting to fix his credit, e.g. communication costs, postage for disputes;

c.     Loss of time attempting to cure the error;

d.     Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life.

e.     Stress associated with attempting to resolve this matter in the last year.

### *Defendants' Conduct Was Willful*

89.     The FCRA allows for a remedy for a "willful" violation. A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the

company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id*. at 69.

90.     Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va*., 526 F.3d 142, 151 (4th Cir. 2008).

91.     As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed. The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

92.     The CRA Defendants have received many thousands of disputes and other complaints regarding the creditors at issue in this case-sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

93.     Just in federal court alone, during the last decade the creditor-furnisher disputed by Plaintiff has had to defend over 340 consumer lawsuits.

94.     In many or even most of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

95.     The CRA Defendants knew or should have known of this litigation history. They use and have access to PACER to investigate and monitor such consumer complaints.

96.     The CFPB has maintained a Consumer Complaint database since 2017. It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

97.     Each Defendant regularly receives unredacted consumer dispute details from this database.

98.     Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

99.     Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

100.    Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

101.    Further, over 35,000 of the CFPB complaints against Equifax, more than 33,000 complaints as to Experian, and just shy of 38,000 against Trans Union were based largely on their failure to reasonably investigate consumer disputes.

102.    Hunter Warfield has been sued approximately 6 times regarding its credit reporting.

103.    Just in the last 12 months alone, Experian, Equifax, and Trans Union have each been sued on by consumers alleging their violation of the FCRA over 2,000 times. Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade.

104.    While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

105.    Experian and Equifax have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g., Centuori v. Experian Info. Sols., Inc*., 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs account. Many courts, including this one, have concluded that where a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

106.    Equifax has even been warned by its home District Court, the Northern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.

> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." Stevenson, 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id*.; see also Henson v. CSC Credit

Servs., 29 F.3d 280, 286-87 (7th Cir. 1994); Swoager v. Credit Bureau, 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

107.    Trans Union has long been on even clearer notice. The Seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Trans Union's notice was so substantial that one District Court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, No. CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

108.    Defendants have also been repeatedly criticized by Federal and State regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

109.    In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.  The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).[4]

110.    The AG Settlement also required the CRA Defendants to conduct significant research and data gathering-even creating a "working group" to address these issues, and to

---

[4] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News- Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

develop special procedures to handle disputes as in this case. Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

111.    Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors, National Consumer Law Center, February 2019. ("NCLC Report").[5]

112.    The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

113.    Among many of the Defendants' accuracy failures, the NCLC Report discovered:

Insufficient Information Conveyed and Considered in Investigation. Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

---

[5] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

Failure to Transmit Information Submitted by the Consumer. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

Perfunctory Credit Bureau Investigations. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two or three digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

Credit Bureaus Always Side with Furnishers. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

114.   Despite the notice and judicial, regulatory and public interest criticism, Defendants have refused to change their dispute investigation process because it would cost too much money to do so.

115.   Defendants' procedures imposed on the Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

### CLAIMS FOR RELIEF

### COUNT I
### Violation of § 1681e(b) of the FCRA - against Experian, Equifax, and Trans Union

116.   The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

117.   Defendants Experian, Equifax, and Trans Union willfully violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible

accuracy in the preparation of the consumer report and consumer files they published and maintained concerning the Plaintiff.

118.    As a result of this conduct, action and inaction of Experian, Equifax, and Trans Union, the Plaintiff suffered damage by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, reduction in lines of credit, and denial for various financial products, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why they lost the ability to benefit from credit.

119.    Further, after the Plaintiff's disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, Experian, Equifax, and Trans Union each ignored such information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of the Plaintiff's credit reports.

120.    Each Defendant furnished multiple consumer reports to third parties containing the inaccurate tradeline information and each Defendant did so after receiving notice of these inaccuracies.

121.    Experian, Equifax, and Trans Union's conduct, action and inaction was willful, rendering them liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

122.    As a result of Experian, Equifax, and Trans Union's violations of 15 U.S.C. § 1681e(b), the Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

123.    The Plaintiff is entitled to recover his costs and attorney's fees from Experian, Equifax, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**Violation of § 1681i of the FCRA - against Experian, Equifax, and Trans Union**

123.    The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

124.    Experian, Equifax, and Trans Union willfully violated 15 U.S.C. § 1681i by failing to delete inaccurate information in the Plaintiff's consumer file after receiving actual notice of such inaccuracies; by failing to conduct a lawful reinvestigation; by failing to forward all relevant information to Plaintiff's creditors and/or creditors' attorneys; by failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiff's credit file; and by relying upon verification from a source it has reason to know is unreliable.

125.    Further, Experian, Equifax, and Trans Union violated Section 1681i by conducting no investigation at all. Section 1681i demands that when Plaintiff notified each CRA directly of his disputes, that party-the consumer reporting agency who received the disputes-must investigate those disputes. The statute does not contemplate someone other than Experian, Equifax, or Trans Union conducting the investigation.

126.    Yet, both Equifax and Trans Union used an unrelated third-party, Teleperformance, over which neither CRA has control, to conduct its investigations. Teleperformance is not, in the words of the statute, "the [consumer reporting] agency" to whom Plaintiff disputed. Equifax and Trans Union therefore violated 1681i on this basis because they sent Plaintiff's disputes away to a company that was not their controlled agent rather than investigating them as required.

127.   Furthermore, Experian used an unrelated third-party, Experian Chile, over which Experian has no direct control, to conduct its investigations. Experian Chile is not, in the words of the statute, "the [consumer reporting] agency" to whom Plaintiff disputed. Experian therefore violated 1681i on this basis because it sent Plaintiff's disputes away to a company that was not its controlled agent rather than investigating them as required.

128.   As a result of Defendants' violations of 15 U.S.C. § 1681i, the Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

129.   Defendants' conduct, action, and inaction was willful, rendering each Defendant liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

130.   The Plaintiff is entitled to recover his costs and attorneys' fees from Experian, Equifax, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT III
## Violation of § 1681s-2(b)(1)(A) of the FCRA – against Hunter Warfield

131.   The Plaintiff realleges and incorporates the foregoing paragraphs above as if fully set out herein.

132.   Defendant Hunter Warfield violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of the Plaintiff's disputes after said disputes were furnished to Hunter Warfield by Experian, Equifax and Trans Union.

133.   As a result of this conduct, action and inaction of Hunter Warfield, the Plaintiff suffered damage by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, reduction in lines of credit, and denial for various financial products, the mental

and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why they lost the ability to benefit from credit.

134.   Hunter Warfield's conduct, action and inaction was willful and it is liable for actual or statutory damages and punitive damages in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n.

135.   The Plaintiff is entitled to recover his costs and attorneys' fees from Hunter Warfield in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT IV
### Violation of § 1681s-2(b)(1)(E) of the FCRA – against Hunter Warfield

136.   The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

137.   Defendant Hunter Warfield violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's disputes from Experian, Equifax, and Trans Union and prior to the commencement of this action. This failure to correct Plaintiff's information resulted from Hunter Warfield's failure to investigate as articulated herein, after Hunter Warfield received notice of Plaintiff's disputes from Experian, Equifax and Trans Union.

138.   As a result of this conduct, action and inaction of Hunter Warfield, the Plaintiff suffered damage by loss of credit, loss of the ability to purchase and benefit from credit, reduction in credit scores, reduction in lines of credit, and denial for various financial products, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why they lost the ability to benefit from credit.

139.   Hunter Warfield's conduct, action and inaction was willful, is liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

140.   The Plaintiff is entitled to recover his costs and attorneys' fees from Hunter Warfield in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment for actual, statutory and punitive damages against Defendants; for his attorneys' fees and costs; for prejudgment and post-judgment interest at the judgment rate; specific performance and injunctive relief; and such other relief the Court deems just and proper.

Respectfully Submitted,

**SETH J. BERL**

By:   */s/ Leonard A. Bennett*
Leonard A. Bennett, VSB #37523
Craig Marchiando, VSB #89736
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: craig@clalegal.com